**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | § | |
| | § | **Criminal No. 4:19-CR-602** |
| **v.** | § | |
| | § | |
| **BARBARA MARINO, M.D.,** | § | |
| | § | |
| | § | |
| | § | |
| **Defendant.** | § | |

**UNITED STATES' RESPONSE TO DEFENDANT'S**
**SUPPLEMENTAL MOTION IN LIMINE**

Defendant's Supplemental Motion in Limine (Dkt. 381) asks the Court to prohibit seven additional categories of evidence.

The first four involve prior convictions of former patients of Dr. Marino's who are expected to testify in her defense. The government does not anticipate introducing any such evidence. Before it does, it will ask to approach.

Defendant's arguments in support of excluding the fifth, sixth, and seventh categories of evidence have no merit. Each is addressed below.

I.    **Category Five – Any civil litigation involving Defendant's expert witness "in his personal capacity" (probative of bias)**

Dr. Lipshutz recently settled a lawsuit with state and federal authorities, which the Attorney General of Nevada announced, requiring Dr. Lipshutz and his entity, Lipshutz & Wills Medical Group, LLP d/b/a Monos Health, to pay $2 million for "improperly and knowingly defraud[ing] Medicaid, Medicare and Tricare for over 3 1/2 years." The Nevada Attorney General thanked the Nevada United States Attorney's Office "for helping us with this important investigation," noting that it started as a federal whistleblower suit filed with that office. The press release accompanying

the announcement stated that Monos Health (Lipshutz's entity)

> performed definitive UDT [urine drug tests] on the same day as presumptive UDT without first reviewing the results of the presumptive test and assessing the individualized need for a definitive test. Additionally, Monos Health unnecessarily performed testing at higher rates when testing at a lower rate using a different billing code would have been sufficient. Finally, Monos Health used standing orders for definitive UDT in violation of Medicaid and Medicare guidelines. The federal government alleges that Monos Health's conduct resulted in the submission of false reimbursement claims to government health care programs, including the Nevada Medicaid Program and Medicare, thereby violating federal law and the Nevada False Claims Statute.

*Attorney General Ford Announces Medical Group to Pay Over $2 Million to Settle Allegations Involving Improper Billing of Urine Drug Testing*, available at https://ag.nv.gov/News/PR/2022/Attorney_General_Ford_Announces_Medical_Group_to_Pay_Over_$2_Million_to_Settle_Allegations_Involving_Improper_Billing_of_Urine_Drug_Testing/.

Impeachment evidence of bias is always relevant. *E.g. United States v. Abel*, 469 U.S. 45, 49 (1984); *accord United States v. Willner*, 795 F.3d 1297, 1320 (11th Cir. 2015) (holding that the district court abused its discretion in precluding cross-examination of government's expert on potential bias). Especially where expert witnesses are concerned, the opposing party "must be given the widest latitude during cross-examination to demonstrate any interest, bias, or motive." *E.g.*, *Jackson v. Reid*, 402 Ill. App. 3d 215, 234, 935 N.E.2d 978 (2010) (internal quotation marks omitted); *accord Ware v. State*, 348 Md. 19, 67, 702 A.2d 699, 722 (1997); *McCaley v. Petrovic*, 2024 IL App (1st) 230918, ¶ 95, 480 Ill. Dec. 848, 253 N.E.3d 1010 (App. Ct. 1st Dist. 2024) (no abuse of discretion where physician expert cross examined about previous professional reprimands in three states, even though physician remained licensed and reprimands were on unrelated issues).

Dr. Lipshutz's recent (c. 2022) $2 million settlement with federal authorities—which, though recent, predates when he was retained by Dr. Marino in this case—is fertile ground for bias

against the federal government, health care oversight agencies, and the Department of Justice.

On these facts, the government must be allowed to test for potential biases and prejudices held by Dr. Lipshutz—who has no personal knowledge concerning this case and will strictly be offered as an expert. *See Walker v. State*, 322 Ga. App. 158, 162, 744 S.E.2d 349, 352 (2013) (no abuse of discretion where prosecutor cross examined expert about criminal charge "to show that the expert witness was antagonistic to state government and biased against the state's prosecution" of similar cases).

## II.        Category Six – All statements of Dr. Suseela Atluru unrelated to her obstetric treatment of S.L.

Defendant concedes she cannot keep out testimony from Dr. Atluru related to Dr. Atluru's prenatal obstetric care of Patient S.L. while Patient S.L. was also receiving opioids and soma from Dr. Marino. The government does not intend to offer Dr. Atluru as a medical expert (though she certainly could qualify as one). However, because it is relevant to her treatment of S.L., Dr. Atluru may testify about her treatment of obstetric patients' pain pre- and post-birth. The government does not plan to elicit testimony regarding general principles of pain management, or Defendant's psychiatric condition. There is no reason for the Court to grant this Motion in Limine.

## III.       Category Seven – All argument and evidence regarding pain clinics about which Dr. Marino had no personal knowledge.

Defendant seeks to excise from the case any testimony about "operations at clinics other than Angel[s]," Dkt. 381 at 12, notwithstanding that Defendant is charged in Count 1 broadly, with conspiring "with ANGELS CLINICA's owners" (the Camerons) and others to unlawfully prescribe controlled drugs, Dkt. 283 at 6.

The Court should deny Dr. Marino's motion in limine and require her to object contemporaneously if she has concerns about the limited and specific other-Cameron-clinic

documents, questions, and testimony the government plans to offer at trial, for several reasons.

    *A.  Other-clinic evidence is inextricably factually intertwined with the operation of Angels*

First, as the Court is aware from the first trial, Dr. Marino *knew* the Camerons operated other clinics—and she worked for at least one of them, as is reflected in the following text message exchange with Angels' office manager, Leticia Herrera:



Excerpt from GEX 603 (text messages exchanged by Leticia Herrerra and Dr. Marino). The same exchange reflects that Dr. Marino worked at two Cameron clinics at once; specifically, the Long Point (Angels) and Fannin locations; and that her payment arrangement was based on number of patients seen, without regard to clinic location.

The broader Cameron-clinic network is also reflected in Dr. Marino's employment

agreement, excerpted below:

> **Physician Employment Agreement**
>
> This Physician Employment Agreement ("Agreement") is made and entered into this 1st day of August 2018 and effective as of August |1, 2018 ("Effective Date") by and between JLC Medical Management Inc., a Texas professional corporation, and Dr. Barbara Marino ("Physician").

Excerpt from GEX 413 (Employment agreement between Dr. Marino and JLC Medical Management). The Recitals section of the same agreement reflects that "JLC Medical Management Inc. desires to employ Physician to render professional services on behalf of JLC Medical Management Inc. **at one or more clinic service centers** (emphasis added)." Further, in the section titled *Services of Physician*, the agreement sets out the contours of the Camerons' multi-clinic world, and directs that Dr. Marino is agreeing to live in it:

> d)     Physician shall be subject to the JLC Medical Management Inc.'s general direction, control and supervision with respect to all activities on behalf of JLC Medical Management Inc., including, without limitation, the assignment of patients to be evaluated and possibly treated by Physician at Physicians discretion, prescriptive delegation to Nurse Practitioners, administrative services, the setting of work hours, the times during which Physician will be on backup coverage, the determination of location(s) where Physician is to provide services pursuant to this Agreement, the setting of vacation and leave, and the establishment of professional policies and procedures.   Without

> limiting the generality of the immediately preceding sentence, JLC Medical Management Inc. shall have the exclusive authority to establish the hours during which Physician is to perform services pursuant to this Agreement, to specify the location(s) at which such services are to be performed, and to determine the patients of JLC Medical Management Inc. who are to be evaluated and possibly treated by Physician.

*Id.* In other words, Dr. Marino agreed that she would follow the Camerons' "general direction, control, and supervision with respect to all activities" she undertook as a Cameron-clinic physician, including "the determination of location(s) where Physician is to provide services." *Id.*

The daily logs and patient files that agents recovered from Angels (and that the government introduced at the first trial) reflect the existence of more than one Cameron clinic, and Dr. Marino's

awareness thereof. For example, the following daily log, signed by Dr. Marino, reflects that multiple Cameron clinics use the same form to track the same metrics, including the Cameron pharmacies that filled the day's prescriptions:



GEX 103A (Daily log from April 2019). And, comparing the following patient file excerpts confirms how forms from one Cameron clinic were whited-out and then used at others:

 

GEX 7 (left-hand side, redacted patient file of C.M.); GEX 2 (right-hand side, redacted patient file

of K.B.); *see also* Tr. Transcript Day 2, cross exam of Leticia Herrera, at 7-8 ("So the papers that were used that said something like Pasadena Clinic, those were already there to be used as a convenience at Angels Clinic?") (excerpt attached to this Response as Ex. A).

The above-referenced exhibits and excerpts illustrate that Dr. Marino's operation of Angels is inextricably *factually* intertwined with how the Camerons operated their other clinics.

### B. Other-clinics evidence properly establishes Dr. Marino's agreement to the charged conspiracy and establishes absence of mistake to do the same.

The United States should also be permitted to introduce limited evidence about other clinics operated by Defendant's co-conspirators—"ANGELS CLINICA's owners" referenced in the Superseding Indictment—for the proper purpose of establishing the contours of Dr. Marino's conspiratorial agreement with the Camerons and establishing absence of mistake (*i.e.*, negating Dr. Marino's defense from the first trial).

The deal the Camerons offered Dr. Marino, which Dr. Marino accepted, was payment of a base daily rate, plus a per-patient bonus after a certain patient threshold, in exchange for Dr. Marino writing prescriptions for the same drugs, to the same types of patients, as the Camerons' other doctors did. Stated differently, the conspiratorial agreement was that in exchange for an over-market wage and easy office hours, Dr. Marino would function as a Cameron vending machine for opioids and soma, from Angels, Fannin, or wherever else the Camerons directed her to work.

Dr. Marino's defense is that there was no agreement with the Camerons to rubber-stamp prescriptions for the same drugs, day-in, day-out; rather, she claims, *her prescriptions at Angels were legitimate exercises of her medical discretion*. That claim is belied by contract terms, overlapping forms, and expected testimony from fact witnesses—who worked at other Cameron clinics that functioned essentially the same way as Angels—about operational similarities between

Angels and the other Cameron clinics. Fact witnesses with personal knowledge should be allowed, for example, to confirm the Camerons' expectations of their physicians, and to relay how they made their expectations known, including through the day-in, day-out documents used at Angels; *e.g.*, the daily logs, which track as "Patient Visit" statistics only Tylenol, Narco [sic], and Oxy [sic]:



Evidence of the Camerons' modus operandi is therefore relevant to—and a *fair and accurate* depiction of—how Dr. Marino agreed with the Camerons that she would operate Angels. Defendant's argument therefore falls flat that "[s]uch evidence would not bear on the charged crimes at all."). Dkt. 381 at 12-13.

Not only is other-clinic evidence intrinsic to the charged conspiracy; it would also be admissible as relevant evidence under Rule 404(b).

The government notes that at the previous trial, after a significant amount of evidence about other Cameron clinic operations had already come in, defense counsel objected to other-clinic evidence during the testimony of Medical Assistant Vanessa Guzman, and the parties approached for a side bar. After a brief discussion, the Court said to counsel for the government, "I'll tell you what, set up with her does she know which clinics that Marino visited. And if she says -- points to

any of them, you can go into those. But shore up her knowledge on that." Tr. Transcript Day 3, direct exam of Vanessa Guzman, at 63-64 (excerpt attached to this Response as Ex. B). The government instead chose at that point to move on.

The government does not view the Court's instruction as a definitive ruling on the issue; however, for the reasons set forth above, the government respectfully urges the Court to reconsider drawing the line at Cameron clinics that Dr. Marino specifically visited, which would artificially constrain the government's proof on the conspiratorial agreement element. *See, e.g.*, *United States v. Coleman,* 78 F.3d 154, 156 (5th Cir.1996) (intrinsic evidence admissible to "complete the story of the crime by proving the immediate context of events in time and place"; *United States v. Randall,* 887 F.2d 1262, 1268 (5th Cir.1989) (such evidence admissible to allow jury to "evaluate all of the circumstances under which the defendant acted"). *Cf. United States v. Virgen-Moreno*, 265 F.3d 276, 285 (5th Cir. 2001) ("Once the government presents evidence of a conspiracy, it only needs to produce slight evidence to connect an individual to the conspiracy.").

> C. *Rule 403 does not preclude admission of other-clinics evidence, when any improper implications can be cured by limiting instructions.*

Finally, Defendant invokes Rule 403, complaining that other-clinic testimony would "mislead[] the jury to believe Dr. Marino was personally aware of allegedly unlawful activities at other clinics."). Dkt. 381 at 12-13. That is a red herring—and a prospect that could be, and should be, cured by a limiting instruction, in the unlikely event that were necessary.

The Fifth Circuit Pattern Instructions also contain the admonishment that "[o]ne may become a member of a conspiracy without knowing all the details of the unlawful scheme or the identities of all the other alleged conspirators," so long as "the Defendant understands the unlawful nature of a plan or scheme and knowingly or intentionally joins that plan or scheme on one

9

occasion." Crm. Pattern Instruction 2.97 (Controlled Substances—Conspiracy); *accord United States v. Prejean*, 429 F. Supp. 2d 782, 798 (E.D. La. 2006) (It is not required that each co-conspirator know the other co-conspirators: there is a conspiracy if there is a "sufficient overlap of personnel" surrounding a "pivotal figure" who "directs and organizes the illegal activity, and has extensive dealings with each of the parties." (citations omitted)). *Cf. United States v. Mitchell*, 484 F.3d 762, 774-775 (5th Cir. 2007) (suggesting that where evidence at trial indicates that some of the defendants were involved only in separate conspiracies unrelated to the overall conspiracy charged in the indictment, a defendant is entitled to an instruction on that theory).

### IV.   Conclusion

The conspiracy charge in the Superseding Indictment names the Camerons as co-conspirators. The purpose of the conspiracy is also defined broadly. Indeed, *Marino joined an existing conspiracy involving several clinics owned and operated by the Camerons.*

One or more of the government's witnesses in this case will be able to testify—from personal knowledge—that the Camerons had an illegal pain clinic model, and that they made these expectations known to the doctors in their employ, including Dr. Marino. *See, e.g.*, GEX 619 at 2 (attached to this Response as Ex. C). The broader Cameron network is visible on cell phones, in business records, and in medical records that will be offered by both parties.

The government respectfully asks the Court to deny Defendant's categorical request to keep out related-clinic evidence, and instead require Defendant to object if and when appropriate at trial.

Respectfully submitted,

JOHN G.E. MARCK
ACTING UNITED STATES
ATTORNEY

*/s/ Drew Pennebaker*
Drew Pennebaker
Yael Mash
Trial Attorneys
U.S. Department of Justice
Criminal Division, Fraud Section
1000 Louisiana, Suite 2300
Houston, Texas 77007
(202) 597-0683
Andrew.Pennebaker@usdoj.gov

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing was electronically filed via the Court's Electronic Case File system and emailed to the counsel for Defendant on March 31, 2026.

/s/ *Drew Pennebaker*
Drew Pennebaker
Trial Attorney